**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| MICHAEL MEEKS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>PROXYCARE, INC., a Florida corporation,<br><br>Defendant. | Case No.<br><br>**CLASS REPRESENTATION**<br><br>DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT

Plaintiff Michael Meeks ("Plaintiff"), individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to him and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendant Proxycare, Inc. ("Proxycare" or "Defendant"), and alleges as follows:

## INTRODUCTION

1. Plaintiff brings this action on behalf of himself and all other individuals similarly situated ("Class Members") against Proxycare for its failure to secure and safeguard the personally identifiable information ("PII") and protected health information ("PHI") (collectively, the "Private Information") of Plaintiff and Class Members.

2. Defendant Proxycare, a Florida corporation, operates as a pharmacy services provider focused on long-term care and assisted living facilities. In the regular course of its business, Proxycare collects, stores, and maintains the PII/PHI of individuals and is required to maintain reasonable and adequate security measures to protect such information from unauthorized access and disclosure.

3. On August 22, 2025, Proxycare learned that an unauthorized third party had gained access to its network and accessed and obtained files containing PII/PHI of its patients (the "Data Breach").

4. Proxycare owed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Proxycare breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect patients' PII/PHI from unauthorized access and disclosure, or by contracting with companies that failed to do so. Every year, millions of Americans have their most valuable PII/PHI stolen and sold online because of data breaches. Despite dire warnings about the severe impact of data breaches on Americans across all economic strata, companies still fail to make the necessary investments in implementing important and adequate security measures to protect their patients' data.

5. Proxycare required its patients to provide sensitive PII/PHI and failed to protect that information. Proxycare had an obligation to secure patients' PII/PHI by implementing reasonable and appropriate data security safeguards. This was part of the bargain between Proxycare and Plaintiff and Class Members.

6. As a result of Proxycare's failure to provide reasonable and adequate data security, Plaintiff's and the Class Members' unencrypted, non-redacted PII/PHI has been exposed to unauthorized third parties. Plaintiff and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PII/PHI stolen here and the fact that the compromised PII/PHI is likely already being sold on the dark web. This risk constitutes a concrete injury suffered by Plaintiff and the Class as they no longer have control over their PII/PHI, which PII/PHI is now in the hands of third-party cybercriminals. This substantial and

imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

7. Plaintiff and the Class will have to incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach.

8. Plaintiff brings this action on behalf of himself and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring Proxycare to ensure that it implements and maintains reasonable data security practices going forward.

## THE PARTIES

9. Plaintiff Michael Meeks is a resident of the state of Florida whose personal and medical information has been compromised in the Data Breach. Upon information and belief, as a result of the Data Breach, Plaintiff has suffered an increase in spam calls and has had fraudulent charges attempted on his bank card/account.

10. Defendant Proxycare is a corporation organized under the laws of the State of Florida with its principal place of business in Sunrise, Florida.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

12. For purposes of the Class Action Fairness Act, Defendant Proxycare is deemed to

be a citizen of both the state in which it has its principal place of business and the state under whose laws it is organized, pursuant to 28 U.S.C. § 1332(d)(10). Proxycare is organized under the laws of Florida and maintains its principal place of business in Sunrise, Florida. Proxycare operates in multiple states, with Florida and Alabama locations listed on its website.

13. This Court has personal jurisdiction over Defendant because it maintains its principal place of business in this District and conducts business in this District.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant has its principal place of business in this District, conducts business in this District, and a substantial part of the events, acts, and omissions giving rise to Plaintiff's and Class Members' claims occurred in this District.

## GENERAL ALLEGATIONS

15. This is a class action brought by Plaintiff, individually and on behalf of all citizens who are similarly situated (i.e., the Class Members), seeking to redress Proxycare's willful and reckless violations of his privacy rights. Plaintiff and the other Class Members are individuals whose Private Information was collected, maintained, and stored by Proxycare in connection with pharmacy and medication management services provided to long-term care and assisted living facilities.

16. On or about August 22, 2025, an unauthorized third party accessed and obtained Plaintiff's and the Class Members' PII/PHI.

17. This action pertains to Proxycare's unauthorized disclosures of Plaintiff's PII/PHI that occurred during the Data Breach.

18. Proxycare disclosed Plaintiff's and the other Class Members' PII/PHI to unauthorized persons as a direct and/or proximate result of Proxycare's failure to safeguard and

protect their PII/PHI.

19. By obtaining, collecting, and storing the PII/PHI of Plaintiff and Class Members, Proxycare assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII/PHI from unauthorized disclosures.

20. Despite recognizing its duty to do so, Proxycare failed to implement security safeguards to protect Plaintiff's and the Class Members' PII/PHI.

21. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII/PHI and relied on Proxycare to keep their PII/PHI confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

***1. The Data Breach***

22. According to a data breach notification ("Breach Notice") sent to Plaintiff and Class Members, unauthorized access to its network systems occurred on or about August 22, 2025. During this period, an unauthorized third party accessed individuals' accounts containing patients' PII/PHI, including full names, email addresses, date of birth, social security numbers, and personal health information.

23. Upon detecting the unauthorized activity, Defendant initiated an investigation and concluded, on or about January 2026, that certain client-related files had been accessed and copied by an unauthorized actor. Beginning in March 2026, Defendant began notifying individuals about which individuals and specific data may have been involved in the Data Breach.

24. The Breach Notice posted on Proxycare's website (https://www.proxycarerx.com/data-security-incident/) did not specify detailed measures or actions taken by Proxycare to fully remediate the vulnerabilities that led to the Data Breach, nor did it explain specific measures adopted to prevent future incidents.

*2. The Data Breach was Preventable*

25. Had Proxycare maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, it could have safeguarded patient data. Proxycare's lack of security controls and the delayed implementation of enhanced security measures only after the Data Breach are inexcusable.

26. Proxycare was at all times fully aware of its obligation to protect patients' PII/PHI and the risks associated with failing to do so. Proxycare knew that information of the type collected, maintained, and stored by Proxycare is highly coveted and a frequent target of hackers.

27. This exposure, along with the fact that the compromised PII/PHI is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:




28. By 2013, it was being reported that nearly one out of four data breach notification recipients become a victim of identity fraud.[1]

[1] Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013), https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last visited June 20, 2025).

29. Stolen PII/PHI is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

30. When malicious actors infiltrate companies and copy and exfiltrate the PII/PHI that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[2]

31. In April 2023, NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attack targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports, the ransomeware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."[3]

32. In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[4]

33. In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million patients was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access to its systems on March 6, with some found to be infected with malicious code…According to MCNA, the hackers were successful in

---

[2] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Feb. 1, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring.
[3] Mark Rosanes, *The insurance industry cyber crime report: recent attacks on insurance businesses*, INSURANCE BUSINESS (June 12, 2023),https://www.insurancebusinessmag.com/us/guides/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx.
[4] *Id.*

accessing patient personal information."[5]

34. In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[6]

35. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[7]

36. Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, are awash with [PII/PHI] belonging to victims from countries all over the world. One of the key challenges of protecting PII/PHI online is its pervasiveness. "As data breaches in the news continue to show, PII/PHI about employees, patients, and the public is housed in all kinds of organizations, and the increasing digital transformation of

---

[5] *Id.*

[6] Catalin Cimpanu, *Ransomware mentioned in 1000 SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.

[7] Multi-State Information Sharing & Analysis Center, *Ransomware Guide*, UNITED STATES CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Sept. 2020), https://www.cisa.gov/sites/default/files/2023-01/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf.

today's businesses only broadens the number of potential sources for hackers to target."[8]

37. The PII/PHI of consumers remains of high value to criminals, as evidenced by the price they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[9] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[10] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[11]

38. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone

---

[8] *Stolen PII/PHI & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018),
https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/stolen-PII/PHIramificati
ons-identity-theft-fraud-dark-web/.

[9] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[10] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc26db2.

[11] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Sept. 30, 2025).

> illegally using your Social Security number assuming your identity can cause a lot of problems.[12]

39. What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

40. Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[13]

41. Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

42. The PII/PHI compromised by the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[14]

---

[12] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION, Pub. No. 05-10064 (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[13] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[14] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-person

43. Once PII/PHI is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII/PHI being harvested from the victim, as well as PII/PHI from family, friends, and colleagues of the original victim.

44. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

45. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

46. Data breaches facilitate identity theft as hackers obtain consumers' PII/PHI and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII/PHI to others who do the same.

47. For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII/PHI to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[15] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face, "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good

al-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[15] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

name."[16]

48. The exposure of Plaintiff's and Class Members' PII/PHI to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off this highly sensitive information.

***3.* Proxycare Failed to Comply with the Federal Trade Commission**

49. Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[17]

50. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines for fundamental data security principles for business.[18] Among other things, the guidelines note that businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to address security issues. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a

---

[16] *Id.*

[17] *See* FEDERAL TRADE COMMISSION, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[18] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

response plan ready in the event of a breach.[19]

51. Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[20]

52. Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII/PHI, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

***4. The Impact of Data Breach on Victims***

53. Proxycare's failure to keep Plaintiff's and Class Members' PII/PHI secure has severe ramifications. Given the highly sensitive nature of the PII/PHI stolen in the Data Breach, Social Security numbers, first and last names, dates of birth, and medical information, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

54. The PII/PHI exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the PII/PHI to: (a) commit insurance fraud; (b)

---

[19] *Id.*

[20] FEDERAL TRADE COMMISSION, *supra* note 17.

obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

55. Further, malicious actors often wait months or years to use the PII/PHI obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII/PHI, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

56. Given the confirmed exfiltration of patient PII/PHI from Proxycare, many victims of the Data Breach have likely already experienced significant harms as a result of the Data Breach, including, but not limited to, identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and spending time and effort searching for unauthorized activity.

57. It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;
- 76% felt violated;
- 32% experienced financial related identity problems;
- 83% reported being turned down for credit or loans;
- 32% reported problems with family members as a result of the breach;

- 10% reported feeling suicidal.[21]

58. Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;
- 37.1% reported an inability to concentrate/lack of focus;
- 28.7% reported they were unable to go to work because of physical symptoms;
- 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and
- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[22]

59. Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

---

[21] IDENTITY THEFT RESOURCE CENTER, *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces* (2021), https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf.

[22] *Id.*

60. The unauthorized disclosure of sensitive PII/PHI to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.[23]

61. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

62. As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a. The unconsented disclosure of confidential information to a third party;

b. Unauthorized use of their PII/PHI without compensation;

c. Losing the value of the explicit and implicit promises of data security;

d. Losing the value of access to their PII/PHI permitted by Proxycare without their permission;

e. Identity theft and fraud resulting from the theft of their PII/PHI;

f. Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g. Anxiety, emotional distress, and loss of privacy;

h. The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

---

[23] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

i. Unauthorized charges and loss of use of and access to their accounts;

j. Lowered credit scores resulting from credit inquiries following fraudulent activities;

k. Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l. The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII/PHI being in the possession of one or more unauthorized third parties.

63. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again, as there is typically significant time and effort associated with seeking reimbursement. The Department of Justice's Bureau of Justice Statistics found that identity theft victims, "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[24]

64. Plaintiff and Class Members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more to work with a provider that has better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[25]

65. Plaintiff and Class Members have a direct interest in Proxycare's promises and

---

[24] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

[25] Richard Turner, *Beyond the Bottom Line: The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html.

duties to protect PII/PHI, i.e., that Proxycare would *not increase* their risk of identity theft and fraud. Because Proxycare failed to live up to its promises and duties in this respect, Plaintiff and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Proxycare's wrongful conduct. Through this remedy, Plaintiff seeks to restore himself and Class Members as close to the same position as they would have occupied but for Proxycare's wrongful conduct, namely its failure to adequately protect Plaintiff's and the Class Members' PII/PHI.

66. Plaintiff and Class Members further seek to recover the value of the unauthorized access to their PII/PHI permitted through Proxycare's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII/PHI is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles, authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiff and Class Members have a protectible property interest in their PII/PHI; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

67. Plaintiff and Class Members have an interest in ensuring that their PII/PHI is

secured and not subject to further theft, as Proxycare continues to hold their PII/PHI.

## CLASS ACTION ALLEGATIONS

68. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the following proposed class (collectively, "the Class"), defined as follows:

> **Nationwide Class**
> All persons residing in the United States whose personally identifiable information was accessed by and disclosed in the Data Breach to unauthorized persons, including all who were sent a notice of the Data Breach.

69. Excluded from the proposed Class are any officer or director of Proxycare; any officer or director of any affiliate, parent, or subsidiary of Proxycare; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

70. **Numerosity.** Members of the proposed Class are likely to number in the tens of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from Proxycare's own records.

71. **Commonality and Predominance.** Common questions of law and fact exist as to the proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

a. Whether Proxycare engaged in the wrongful conduct alleged herein;

b. Whether Proxycare's inadequate data security measures were a cause of the Data Breach;

c. Whether Proxycare owed a legal duty to Plaintiff and the other Class Members to exercise due care in collecting, storing, and safeguarding their PII/PHI;

d. Whether Proxycare negligently or recklessly breached legal duties owed to Plaintiff and the Class Members to exercise due care in collecting, storing, and safeguarding their PII/PHI;

e. Whether Plaintiff and the Class are at an increased risk for identity theft because of the Data Breach;

f. Whether Proxycare failed to implement and maintain reasonable security procedures and practices for Plaintiff's and Class Members' PII/PHI;

g. Whether Plaintiff and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

72. Proxycare engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

73. **Typicality:** Plaintiff's claims are typical of the claims of the Members of the Class. All Class Members were subject to the Data Breach and had their PII/PHI accessed by and/or disclosed to unauthorized third parties. Proxycare's misconduct affected all Class Members in the same manner.

74. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

75. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class Members are relatively small compared to

the burden and expense that would be required to litigate their claims on an individual basis against Proxycare, making it impracticable for Class Members to individually seek redress for Proxycare's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments, increasing the delay and expense for all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class Against Defendant)

76. Plaintiff realleges paragraphs 1 through 75 as if fully set forth herein.

77. Plaintiff brings this claim individually and on behalf of the Class.

78. To obtain prescription fulfillment and related pharmacy services, Plaintiff and Class Members were required to provide non-public personal and health information to Proxycare. Plaintiff and Class Members are current or former customers of Proxycare who entrusted their sensitive PII/PHI to Proxycare in connection with those services. That information was collected, stored, and maintained by Proxycare as part of its operations, and Plaintiff and Class Members reasonably expected Proxycare to safeguard their information consistent with its legal and contractual obligations.

79. By collecting, storing, sharing, and using individuals' data on the Defendant's computer network for commercial gain, Proxycare owed a duty to Plaintiff and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' PII/PHI from being compromised, lost, stolen, and accessed by unauthorized

persons. This duty includes, among other things, designing, maintaining, and testing its data security systems to ensure that Plaintiff's and Class Members' PII/PHI in Defendant's possession was adequately secured and protected.

80. Defendant owed a duty of care to Plaintiff and Class Members to maintain data security according to industry standards and other relevant requirements. Defendant was also responsible for ensuring their systems, networks, and personnel adequately protected the Private Information.

81. Defendant's duty of care to use reasonable security measures arose from the relationship between Proxycare and Plaintiff and Class Members, who entrusted their sensitive PII/PHI to Proxycare in connection with prescription fulfillment and related pharmacy services. This duty is recognized by applicable laws and regulations, including but not limited to HIPAA, as well as common law principles requiring reasonable care in safeguarding confidential information. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members resulting from a Data Breach.

82. Defendant's duty was to implement reasonable security measures under HIPAA to safeguard confidential data from both intentional and unintentional use or disclosure. This included establishing appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information, as required by 45 C.F.R. § 164.530(c)(1). Some or all of the healthcare, medical, and related information involved in this case qualifies as "protected health information" according to the relevant definition of HIPAA.

83. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair

practice of failing to use reasonable measures to protect confidential data.

84. Proxycare breached its duties by failing to exercise reasonable care and failing to safeguard and protect Plaintiff's and the other Class Members' PII/PHI.

85. It was reasonably foreseeable that Proxycare's failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class Members' PII/PHI would result in an unauthorized third-party gaining access to such information for no lawful purpose.

86. As a direct result of Proxycare's breach of its duty of confidentiality and privacy and the disclosure of Plaintiff's and Class Members' confidential information, Plaintiff and the Class Members suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

87. Neither Plaintiff nor other Class Members contributed to the Data Breach as described in this Complaint.

88. Proxycare's wrongful actions and/or inaction and the resulting Data Breach (as described above) constituted (and continue to constitute) negligence at common law.

89. As a result of Proxycare's above-described wrongful actions, inaction that directly and proximately caused the Data Breach, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in

Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) the diminished value of data-security protections promised for Plaintiff' information.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Nationwide Class)**

90. Plaintiffs reallege paragraphs 1 through 75 as if fully set forth herein.

91. Plaintiff brings this claim individually and on behalf of the Class.

92. Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Proxycare had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Personal Information.

93. Pursuant to HIPAA, 42 U.S.C. § 1302d, et seq., Proxycare, as a covered entity and/or business associate that handled electronic protected health information in connection with its pharmacy operations, had a duty to implement reasonable administrative, technical, and physical safeguards to protect Plaintiff's and Class Members' Private Information.

94. Pursuant to HIPAA, Defendant had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* 45 C.F.R. § 164.304 (definition of encryption).

95. Defendant breached its duties to Plaintiff and Class Members under the Federal Trade Commission Act, 15 U.S.C. § 45, and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Personal Information.

96. Defendant's failure to comply with applicable laws and regulations constitutes

negligence *per se*.

97. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

98. The injury and harm suffered by Plaintiff and Class Members were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties, and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Personal Information.

99. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members now face an increased risk of future harm.

100. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

101. Plaintiff realleges paragraphs 1 through 75 as if fully set forth herein.

102. When Plaintiff and Class Members provided their Private Information in connection with obtaining prescription services from Proxycare, and Proxycare thereafter collected, stored, and maintained that information as part of its pharmacy operations, Plaintiff and Class Members entered into implied contracts with Proxycare under which Proxycare agreed to reasonably safeguard and protect their Private Information.

103. Proxycare solicited, received, accessed, stored, and processed Plaintiff's and Class Members' Private Information as part of its regular pharmacy operations, including prescription fulfillment and related services. Plaintiff and Class Members provided their Private Information to Proxycare with the reasonable expectation that it would be safeguarded and protected from

unauthorized access.

104. In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Proxycare's data security practices complied with relevant laws and regulations, including HIPAA, and adhered to industry standards applicable to the protection of sensitive healthcare and insurance information.

105. Plaintiff and Class Members paid money for prescription medications and related pharmacy services, with the reasonable belief and expectation that a portion of those payments would be used to implement and maintain adequate data security measures. Proxycare failed to maintain reasonable and adequate data security.

106. Plaintiff and Class Members would not have entrusted their Private Information to Proxycare in connection with obtaining prescription services in the absence of the implied contracts under which Proxycare agreed to keep such information reasonably secure.

107. Plaintiff and Class Members would not have provided their Private Information to Proxycare, or permitted that information to be collected and maintained by Proxycare, absent Proxycare's implied promises to monitor its computer systems and networks and to adopt reasonable data security measures to protect that information from unauthorized access.

108. Proxycare breached its implied contract with Plaintiff and Class Members by failing to safeguard and protect their Private Information.

109. As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

110. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

111. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, inter alia: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring and identity protection services to all Class Members.

**COUNT IV**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiff and the Nationwide Class)**

112. Plaintiff realleges paragraphs 1 through 75 as if fully set forth herein.

113. Plaintiff and the Class had a legitimate expectation of privacy in their highly sensitive and confidential Private Information, including medical, prescription, and billing-related information maintained by Defendant in connection with its pharmacy services for long-term care and assisted living facilities.

114. Defendant, as a provider of pharmacy and medication management services entrusted with residents' and patients' Private Information, owed a duty to Plaintiff and the Class to maintain the confidentiality and security of that information and to protect it from unauthorized access and disclosure.

115. The unauthorized acquisition (i.e., theft) of Plaintiff's and Class Members' Private Information by a third party constitutes an intrusion that would be highly offensive to a reasonable person.

116. The intrusion was into matters that were private and entitled to be private. Plaintiff and the Class provided their sensitive and confidential information to Defendant in the context of receiving healthcare and pharmacy-related services, with the reasonable expectation that such information would be securely maintained and not disclosed without authorization.

117. The Data Breach constitutes an intentional intrusion upon Plaintiff's and the Class's solitude or seclusion, or private affairs or concerns, of a kind that would be highly offensive to a

reasonable person.

118. Defendant acted with a knowing state of mind by maintaining and utilizing inadequate data security practices despite its role in handling highly sensitive medical and personal information.

119. Defendant further acted with a knowing state of mind by failing to timely notify Plaintiff and the Class of the Data Breach, thereby impairing their ability to take prompt mitigating actions.

120. Defendant knew or should have known that its failure to implement reasonable cybersecurity measures would result in the compromise of Plaintiff's and the Class's Private Information.

121. As a direct and proximate result of Defendant's acts and omissions, Plaintiff's and the Class's Private Information was accessed and acquired by unauthorized third parties and is at risk of further misuse and disclosure, causing damages.

122. Upon information and belief, Plaintiff's and the Class's Private Information has been, or will imminently be, disseminated by cybercriminals, including through illicit online marketplaces.

123. Absent injunctive relief, Defendant's continued retention of Plaintiff's and the Class's Private Information in an inadequately secured environment will result in ongoing and irreparable harm.

124. Plaintiff and the Class lack an adequate remedy at law for the continuing risk posed by Defendant's failure to safeguard their Private Information. Monetary damages alone cannot remedy the ongoing threat of misuse of their data.

125. Plaintiff, individually and on behalf of the Class, seeks injunctive relief,

compensatory damages, including the value of the privacy interest invaded, costs associated with credit monitoring and identity protection, prejudgment interest, and all other relief the Court deems just and proper.

**COUNT V**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Nationwide Class)**

126. Plaintiff realleges paragraphs 1 through 75 as if fully set forth herein.

127. Plaintiff and Class Members conferred a benefit upon Proxycare in the form of their Private Information, which Proxycare collected, stored, and used in connection with prescription fulfillment and related pharmacy services, with the implicit understanding that Proxycare would adequately safeguard the PII/PHI entrusted to it. Additionally, Proxycare received payment for prescription medications and related services provided to Plaintiff and Class Members.

128. Proxycare accepted and had knowledge of the benefits conferred upon it by Plaintiff and Class Members, including access to, use of, and reliance upon their PII/PHI in the ordinary course of its pharmacy operations. Proxycare further benefited financially from providing prescription and related services to Plaintiff and Class Members while retaining and utilizing their sensitive information.

129. As a result of Proxycare's conduct, Plaintiff and Class Members suffered actual damages.

130. Proxycare should not be permitted to retain monies paid to it for prescription medications and related pharmacy services involving Plaintiff's and Class Members' information because Proxycare failed to adequately implement the data privacy and security procedures required by applicable laws and industry standards.

131. Proxycare should be compelled to provide, for the benefit of Plaintiff and Class Members, all unlawful proceeds received by it as a result of the conduct and Data Breach alleged

herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Petition, respectfully request that the Court enter judgment in their favor and against Proxycare, as follows:

(a) Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing Plaintiff's counsel as Lead Counsel for the Class;

(b) Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

(c) Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Proxycare from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

(d) Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

(e) Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

(f) Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all appropriate issues raised in this Class Action Complaint.

Dated: April 8, 2026

Respectfully submitted,

*/s/ Robert R. Jimenez*
Robert R. Jimenez (FBN 72020)
Valentina Rios Barboza (FBN 1070256)*
**BRYSON HARRIS SUCIU**
**& DEMAY PLLC**
201 Sevilla Avenue, Suite 200
Miami, Florida 33134
P: (786) 206-7896
rjimenez@brysonpllc.com;
vbarboza@brysonpllc.com;
lblanco@brysonpllc.com;
ajaramillo@brysonpllc.com

**Application for Admission forthcoming*

*Counsel for Plaintiff and the Class*